STATE of Utah, Plaintiff and Appellant,

v.

Daniel R. TROYER, Defendant
and Appellee.

No. 910320.

Supreme Court of Utah.

Dec. 7, 1995.

Rehearing Denied Feb. 13, 1996.

Jan Graham, Atty. Gen., Kenneth A. Bronston, Asst. Att'y Gen., and Gregory S. Skordas, Salt Lake City, for plaintiff.

James A. Valdez, Joan C. Watt, and Mark R. Moffat, Salt Lake City, for defendant.

RUSSON, Justice:

The State of Utah appeals four separate trial court orders granting defendant Daniel R. Troyer's motions to suppress (1) evidence derived from a custodial interrogation, (2) Troyer's statements to Seattle police officers, (3) DNA evidence, and (4) the testimony of prison inmates. As a result of the suppression orders, the State was unable to proceed with its case against Troyer, and consequently, the case was dismissed.[1] We affirm in part, reverse in part, and remand.

## I. FACTS

We initially recite the facts briefly to clarify the context in which the suppression orders arose. Facts relating to each suppression order are developed in greater detail in the corresponding analysis section.

On August 18, 1988, Ethel Luckau, an eighty-eight-year-old woman, was found dead in her home. She was last seen alive at approximately 9:00 a.m. on August 17, and from an autopsy report, it was believed she died that day. The autopsy report indicated the death to be a homicide caused by asphyxiation, possibly due to strangulation or smothering.

At the time of the homicide, Troyer had been transferred from the Utah State Prison to the Bonneville Community Correctional Center ("Bonneville"), a state-run correctional facility, where he was participating in a sex offenders program. According to the records at Bonneville, Troyer had been granted a temporary release from the facility to seek employment on the day of Luckau's murder. On August 19, 1988, at the suggestion of another officer, Detective Don Bell sought Troyer for questioning in connection with Luckau's murder. The police arrived at Bonneville and escorted Troyer to the station house for questioning. There, Troyer was interrogated without the benefit of *Miranda* warnings[2] for approximately one and a half hours. At one point during this interrogation, Troyer claimed that he was with his sister, Bonnie Troyer, on the afternoon of August 17, the date of the murder.

Shortly after the interrogation ended, Troyer telephoned Bonnie. During this telephone conversation, Troyer requested that Bonnie provide him with an alibi if questioned by the police. She agreed to do so even though she had not been with defendant on the date of the murder.

Four days later, on August 23, 1988, Troyer absconded from Bonneville. On October 14, 1988, the Seattle police received information that Troyer would be arriving on a certain Greyhound bus. Seattle police officers Lishner and Holley met the bus and arrested Troyer. At the bus station, the officers read Troyer his *Miranda* rights and asked him if he understood his rights, to which he responded that he understood. Officer Lishner advised Troyer that he was being arrested for "investigation of a fugitive." Troyer remained silent at the bus station and during the drive to the police station. At the station house, Officer Lishner again read Troyer the *Miranda* warnings. Again, Troyer was asked if he understood his rights, and again, he answered affirmatively. Officer Lishner then proceeded to ask Troyer if he knew why he was being arrested. Troyer responded that he had "escape[d] from prison" because "he had attempted to rape a 60–year old woman" and "[h]e was getting nervous because people were asking him questions about it." Troyer further stated that he was in prison for burglary and had escaped from prison around September 1, 1988.

---

1. This case was previously appealed to this court on the issue of whether the State had a right to appeal from a final judgment of dismissal for lack of evidence after its petition for an interlocutory appeal of one of the trial court's suppression orders was denied. *State v. Troyer*, 866 P.2d 528, 528 (Utah 1993). We held that the State had such a right, *id.* at 531, and the instant appeal followed.

2. For purposes of this appeal, the State concedes that Troyer was subjected to a custodial interrogation without the benefit of *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966).

Following Troyer's extradition to Utah, the State charged Troyer with murder in the first degree, a capital offense, in violation of Utah Code Ann. § 76–5–202(1)(a), (d), (h), burglary, a second degree felony, in violation of Utah Code Ann. § 76–6–202, and being a habitual criminal, a first degree felony, in violation of Utah Code Ann. § 76–8–1001. During the initial pretrial proceedings, the trial court entered two separate suppression orders. In the first order, dated January 16, 1990, the trial court suppressed "[a]ny and all statements made by Defendant during a telephone conversation with his sister on August 19, 1988, including an attempt by Daniel Troyer to corroborate an alibi." The trial court directed that such statements could not be used for any purpose, including any attempt to impeach Troyer's credibility. On February 1, 1990, the trial court entered a second suppression order stating that "all incriminating statements made to any [Seattle] law enforcement officers involved in the extradition of Daniel Troyer ... [are] hereby suppressed."

The State also intended to introduce DNA evidence at trial. Apparently, the State was utilizing a controversial polymerase chain reaction (PCR) testing procedure, and defendant was having difficulty locating an expert to analyze the test results. After several hearings and motions, Troyer indicated that he had finally found an expert but that the expert needed access to all the materials and data used in connection with the State's DNA testing. Furthermore, Troyer indicated that it would take his expert approximately six months to complete the analysis of the data and that following these six months, Troyer anticipated a lengthy hearing to determine the admissibility of such evidence. In addition, Troyer requested that the State pay for all travel and trial costs incurred in bringing his DNA expert to Salt Lake City.

On April 27, 1990, at a hearing on Troyer's motion to secure an out-of-state witness, defendant's DNA expert, the State represented to the court that it would no longer use DNA evidence at trial. The State's decision was

purportedly based on the "hoops" and "hassles" it was encountering in trying to satisfy Troyer. Despite the State's assertion that it would not use this evidence, the trial court granted Troyer's discovery requests for information on the State's DNA testing results and permitted Troyer to continue to explore whether the DNA results could be exculpatory. In an order dated May 21, 1990, the trial court summarized its decision: "[T]he State of Utah ... withdrew from evidence the results of PCR DNA tests performed ... on forensic evidence associated with the case.... The defense may employ independent experts to evaluate the testing techniques and test results of all PCR DNA testing conducted in [this] matter."

Subsequently, on January 3, 1991, the State informed the trial court that it had changed its decision and now intended to use DNA evidence at trial.[3] The State maintained that because the trial court continued to allow defendant to proceed with his own DNA testing, the prosecution assumed it would likewise be allowed to utilize such evidence. The trial court, however, issued a third suppression order, which stated, "Based upon representations of the prosecutor made on April 27, 1990, the Court orders that the prosecutor will not be allowed to use evidence of DNA testimony in the trial of this matter."

During the preliminary proceedings, the State also attempted to have Troyer moved from the Salt Lake County Jail to the Utah State Prison. On January 8, 1990, the trial court entered an order granting the State's request.

On January 24, 1990, Troyer petitioned the court for a hearing on the issue of whether he should continue to be housed at the prison. The reason for the request was that certain inmates had approached Troyer with detailed information about his case and he was concerned that an inmate with access to such information would fabricate a confession attributable to him. The State argued that Troyer should remain at the prison and assured the trial court that it did not have any

3. At this point, the trial had been set for February 11, 1991. Upon learning that the State intended to use DNA evidence, defendant request-
ed and was granted a continuance until May 6, 1991, to examine certain evidentiary samples.

informants planted at the prison and that it would not use prison inmates as witnesses at trial. On the basis of the State's representations, the court ordered that Troyer remain at the prison.

On November 30, 1990, the State indicated that it intended to use the testimony of prison inmate David Ray Coon at trial. Troyer moved to suppress this evidence on the basis of the prosecution's prior assurances that it would not use such testimony. On March 21, 1991, the trial court granted Troyer's motion, suppressing all testimony of any prison inmate and ordering that Troyer be moved from the prison to the county jail.

At a hearing on April 23, 1991, the State represented that as a result of the four suppression orders outlined above, it was unable to proceed with the prosecution of this case. Accordingly, on June 6, 1991, defendant moved for and was granted a dismissal of all charges. The State now appeals from the trial court's order of dismissal, specifically seeking review of the four suppression orders.

## II. STANDARD OF REVIEW

We review the factual findings underlying the trial court's decision to grant the motions to suppress evidence under the clearly erroneous standard. *State v. Brown,* 853 P.2d 851, 854 (Utah 1992). This court will find clear error only if we decide that the factual findings made by the trial court are not adequately supported by the record. *State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994). In addition, we consider the facts in a light most favorable to the trial court's determination. *Id.* However, this court reviews the trial court's conclusions of law based on such facts under a correctness standard, *State v. Ramirez,* 817 P.2d 774, 781–82 (Utah 1991), according no deference to its legal conclusions. *Pena,* 869 P.2d at 936; *State v. Deli,* 861 P.2d 431, 433 (Utah 1993). Under these standards, we now evaluate each suppression order in turn.

## III. EVIDENCE DERIVED FROM CUSTODIAL INTERROGATION

The first suppression order entered by the trial court stems from the August 19, 1988, custodial interrogation of Troyer. This interrogation lasted approximately one and a half hours, with the bulk of the time devoted to clarifying Troyer's whereabouts on the day of the murder, August 17, 1988.

Detective Don Bell, who conducted the interrogation, repeatedly questioned Troyer regarding his whereabouts on August 17. At one point, apparently on his third recounting of his activities on that day, Troyer indicated for the first time that he had visited his sister Bonnie at the Tri Arc Hotel and had returned to Bonneville late due to their visit. Upon Bell's further questioning, Troyer became visibly upset, apparently because Bell did not immediately explain the reason for the interview and because Bell sought clarifications of Troyer's inconsistencies concerning his whereabouts and criminal history. As the interrogation continued, Troyer calmed down and further described his activities on the days surrounding the murder.

During the interrogation, Bell suggested, untruthfully, that the police had a witness who could place Troyer in the area of the homicide. Apparently, at this point, Troyer became upset again and asked Bell "to either charge him or let him go, but he wasn't going to talk anymore about anything." Bell stated that he was not charging Troyer with anything and that he "just wanted to make sure [he] understood [Troyer's] answers to the questions." In closing, Bell asked Troyer if he would voluntarily take a polygraph test and submit hair samples. Troyer refused to take the polygraph and requested to consult an attorney about giving hair samples. Bell then left the interrogation room, and Detective Hutchinson talked with Troyer about other matters for approximately ten minutes. At Troyer's request, all questioning stopped except Troyer was again asked to submit hair samples and take a polygraph.

In the course of investigating Troyer's alibi, the police contacted Bonnie Troyer. Bonnie told the police that Troyer had telephoned her on August 19, shortly after the conclusion of the interrogation. She told them Troyer said that he had been questioned by the police and asked her to tell them that she had been with him for the

greater part of the day on August 17, 1988. Bonnie also stated that she had told her brother that she would lie and provide him with an alibi.

In preparation for trial, Troyer moved to have all statements made by him and all evidence gained as a result of the interrogation suppressed. Specifically, Troyer argued that the custodial interrogation was coercive and that his statements were made involuntarily, in violation of the Fourth and Fifth Amendments. Moreover, Troyer maintained that because the interrogation was coercive, all evidence gained as a direct result of the interrogation, including the testimony of his sister, needed to be suppressed as "fruit of the poisonous tree." The State, while conceding that Troyer was subjected to a custodial interrogation without the benefit of *Miranda* warnings, opposed Troyer's motion to suppress, arguing that (1) the interrogation was not coercive, (2) Troyer's statements had been made voluntarily, and (3) no constitutional violation had occurred.

On January 16, 1990, the trial court entered a suppression order stating:

2) Any and all statements made by Daniel Troyer to Detective Don Bell on August 19, 1988, were taken in violation of Defendant's constitutional rights as guaranteed by the Fifth Amendment and Article I, Section 12 rights [sic] and must be suppressed.

3) Any and all statements made by Defendant during a telephone conversation with his sister on August 19, 1988, including an attempt by Daniel Troyer to corroborate an alibi, must be suppressed as "fruits" of the violation of Defendant's Fifth Amendment rights and Article I, Section 12 rights.

The trial court further stated that neither Troyer's own statements nor the "fruits" could be used in the State's case in chief or for any other purpose, including any attempt to impeach Troyer's credibility. In concluding that a Fifth Amendment violation had occurred, the trial court made no specific findings related to the alleged coercive na-

ture of the interrogation. The trial court merely found that "[d]efendant became visibly upset during the questioning. He was asked to make explanations as to his whereabouts in seeking employment on the day in question." Furthermore, in its order, the trial court specifically noted that no violation of the Fourth Amendment had occurred:

5) Mr. Troyer's constitutional rights as guaranteed in the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Utah State Constitution were not violated when police removed Mr. Troyer from the Bonneville Correctional facility, transported him to the Metropolitan Hall of Justice and interrogated him.

On appeal, the State contends that the trial court erred in suppressing Bonnie's testimony and determining that Troyer's statements were inadmissible for impeachment purposes. Specifically, the State argues that the trial court erroneously equated a *Miranda* violation with a Fifth Amendment violation inasmuch as there were no findings that the interrogation was coercive or that the statements were involuntarily made.[4] Therefore, the State maintains, because the fruit-of-the-poisonous-tree doctrine is applicable only when there has been a constitutional violation and no such violation occurred here, this evidence was erroneously suppressed. The State further asserts that statements taken solely in violation of *Miranda* are still admissible to impeach a defendant's testimony.

The United States Supreme Court has held that "a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment." *Oregon v. Elstad,* 470 U.S. 298, 306 n. 1, 105 S.Ct. 1285, 1292 n. 1, 84 L.Ed.2d 222 (1985) (citing *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630–31, 81 L.Ed.2d 550 (1983); *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974)). Moreover, absent inherently coercive police tactics, " 'the Fifth Amendment privilege is not violated by even the most damning admissions.' " *Id.* at

---

4. The State concedes that Troyer was subject to a custodial interrogation which mandated *Miranda* warnings and that Troyer's unwarned statements made in response to a custodial interrogation may not be used in the prosecution's case in chief.

305 (quoting *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977)); *see also Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986) (holding that a statement is not involuntary, in violation of due process rights, unless it has been obtained by coercive police activity).

Cases that implicate the Fifth Amendment must, by definition, involve an element of coercion, since the Fifth Amendment protects individuals from being *compelled* to give evidence against themselves. Moreover, cases involving Fifth Amendment violations

> often depict severe pressures which may override a particular suspect's insistence on innocence. Fact situations ranging from classical third-degree torture, to prolonged isolation from family or friends in a hostile setting, or to a simple desire on the part of a physically or mentally exhausted suspect to have a seemingly endless interrogation end, all might be sufficient to cause a defendant to accuse himself falsely.

*Tucker,* 417 U.S. at 448–49, 94 S.Ct. at 2366 (citations omitted).

■ To determine whether a suspect's statements were coerced, courts look to the totality of circumstances. *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993). Factors to consider in examining the "totality of the circumstances" include "not only the crucial element of police coercion, the length of the interrogation, its location, its continuity, defendant's maturity, education, physical condition, and mental health. They also include the failure of police to advise defendant of his rights [under *Miranda* ]." *Id.* (citations omitted).

■ The circumstances presented here are a far cry from cases in which a Fifth Amendment violation was held to have occurred. *See, e.g., Darwin v. Connecticut,* 391 U.S. 346, 349, 88 S.Ct. 1488, 1489, 20 L.Ed.2d 630 (1968) (suspect interrogated for thirty to forty-eight hours while officers denied access to counsel); *Beecher v. Alabama,* 389 U.S. 35, 36, 38, 88 S.Ct. 189, 190, 191, 19 L.Ed.2d 35 (1967) (officer fired rifle next to suspect's ear and said, "If you don't tell the truth I am going to kill you"); *Clewis v. Texas,* 386 U.S. 707, 711, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967) (suspect was arrested without probable cause and interrogated intermittently for nine days with little food or sleep); *Reck v. Pate,* 367 U.S. 433, 435, 439–40 & n. 3, 442, 81 S.Ct. 1541, 1543, 1545–46 & n. 3, 1547, 6 L.Ed.2d 948 (1961) (mentally retarded youth interrogated incommunicado for a week, "during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher").

Here, the following facts establish that Troyer's statements were not coercively obtained: (1) Troyer was never subjected to any actual physical or mental coercion; (2) the purpose of the repeated questioning was to clarify inconsistent renditions of his whereabouts; (3) the interrogation lasted for only one and a half hours; (4) the interrogation was conducted at the police station, not at the scene of the crime; and (5) at the time of the interrogation, Troyer was both physically and mentally fit. Moreover, Troyer did not even incriminate himself. In fact, he steadfastly maintained his innocence. There is nothing in the record to suggest that the tactics used by the police in interviewing Troyer rise to the level of a Fifth Amendment violation. Accordingly, we hold that no such violation occurred.

Having determined that no constitutional violation occurred, we next address whether the *Miranda* violation, in and of itself, (1) requires suppression of Bonnie's testimony and (2) renders Troyer's statements inadmissible for purposes of impeachment.

■ With regard to Bonnie's statement that Troyer asked her to fabricate an alibi, it is significant that this evidence was not directly derived from Troyer's illegal interrogation. During the August 19 questioning, Troyer revealed the identity of Bonnie but not Bonnie's incriminating statement. Her statement is more the result of her own free will and volition than Troyer's illegal interrogation. This fact alone distinguishes the present case from those cited by Troyer for the proposition that evidence derived from an interrogation in violation of *Miranda* must be suppressed. In each of these cases, the

excluded evidence was the direct result of the illegal interrogation; the suspect either revealed the location of incriminating evidence or gave an incriminating statement. *See People v. Saiz,* 620 P.2d 15, 19–20 (Colo.1980) (en banc) (incriminating statement); *People v. Lowe,* 616 P.2d 118, 121, 123 (Colo.1980) (en banc) (incriminating statement); *State v. Blackshire,* 861 P.2d 736, 743–44 (Haw.Ct. App.1993) (location of incriminating evidence); *Satter v. Solem,* 434 N.W.2d 725, 726–27 (S.D.), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989) (incriminating statement).

The United States Supreme Court has held, "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes." *Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). In *Oregon v. Elstad,* the Court pointed out that the "*Miranda* presumption" of compulsion, although "irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted" for other purposes. *Elstad,* 470 U.S. at 307, 105 S.Ct. at 1292.

In *Elstad,* the Court was asked to extend the fruit-of-the-poisonous-tree doctrine[5] to exclude a fully mirandized confession given after an earlier interrogation where *Miranda* warnings were not administered. *Id.* at 300, 105 S.Ct. at 1288. The Court held that due to the "absence of any coercion or improper tactics," suppression was not justified. *Id.* at 309, 105 S.Ct. at 1293. The Court reasoned:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a sub-

sequent voluntary and informed waiver is ineffective for some indeterminate period. *Id.*

■ We believe, as did the United States Supreme Court, that this reasoning applies with equal force when the alleged "fruit" of a noncoercive *Miranda* violation is witness testimony. *See id.* at 308, 105 S.Ct. at 1292–93 (finding no material distinction between *witness testimony* derived from interrogation in violation of *Miranda* and *subsequent confession* derived from interrogation in violation of *Miranda;* like the former, the latter need not be excluded). The *Miranda* violation alone does not "so taint[ ] the investigatory process" as to make suppression warranted. Although suppression would arguably serve to deter future *Miranda* violations, the remaining rationale for suppressing coerced evidence—assuring trustworthiness—would be undercut. *See id.* at 308–09, 105 S.Ct. at 1292–93 (stating protection from reliance upon untrustworthy evidence as second justification for Fifth Amendment's exclusionary rule). "There is plainly no reason to believe that [a third-party witness's] testimony is untrustworthy simply because [the defendant] was not advised of *his* right to appointed counsel." *Tucker,* 417 U.S. at 449, 94 S.Ct. at 2366. This type of testimony is subject to the "normal testing process of an adversarial trial." *Id.* Therefore, we hold that where an unwarned statement is voluntary and not the product of "inherently coercive police tactics or methods offensive to due process," *id.* at 317, 105 S.Ct. at 1297, there is no Fifth Amendment violation and the fruits may be admissible in the state's case in chief. *Accord United States v. Sangineto–Miranda,* 859 F.2d 1501, 1517 (6th Cir.1988) (citing *United States v. Bengivenga,* 845 F.2d 593 (5th Cir.1988); *United States v. Cherry,* 794 F.2d 201, 207–08 (5th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987)).

In the instant case, having determined that Troyer's Fifth Amendment rights were not violated, the trial court erred in suppressing Bonnie's testimony. Troyer's Fifth Amend-

---

5. The fruit-of-the-poisonous-tree doctrine, as enunciated in *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963), requires the exclusion at trial of evidence obtained through a violation of the Fourth or Fifth Amendments.

ment right against self-incrimination is not implicated by Bonnie's testifying at trial and thereby subjecting herself and her testimony to cross-examination. There is simply no reason to believe that Bonnie's testimony is inherently untrustworthy. *See Tucker*, 417 U.S. at 449, 94 S.Ct. at 2366. Accordingly, we reverse the trial court's order suppressing this evidence.

■ With regard to the State's ability to introduce Troyer's statements into evidence for the sole purpose of impeaching his credibility, the United States Supreme Court has held that "although statements taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant." *Michigan v. Harvey*, 494 U.S. 344, 350–51, 110 S.Ct. 1176, 1179–81, 108 L.Ed.2d 293 (1990) (citing *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris*, 401 U.S. at 225–26, 91 S.Ct. at 645–46)). The Court reasoned that if defendants exercise their right to testify on their own behalf, they assume a reciprocal " 'obligation to speak truthfully and accurately.' " *Id.* at 351, 110 S.Ct. at 1180 (quoting *Harris*, 401 U.S. at 225, 91 S.Ct. at 645). Consequently, the Supreme Court has consistently rejected any argument which would allow a defendant to " 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " *Id.* (quoting *Harris*, 401 U.S. at 224, 91 S.Ct. at 645); *accord Hass*, 420 U.S. at 722, 95 S.Ct. at 1220; *United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980).

Accordingly, we conclude that the trial court erred in determining that Troyer's statements were inadmissible for the purpose of impeaching his credibility should he decide to testify in his own behalf.

## IV. STATEMENTS TO SEATTLE POLICE

The trial court's second suppression order concerned statements Troyer made to Seattle police officers upon his arrest. Troyer absconded from the Bonneville Community Correctional Center on August 23, 1988. Nearly two months later, on October 14, 1988, Troyer was apprehended at a Greyhound bus terminal in Seattle, Washington. Upon his capture, Troyer was read his *Miranda* rights and asked if he understood them, to which Troyer responded in the affirmative.

Troyer was transported to the downtown precinct, where he was mirandized a second time, and again he stated that he understood his rights. Seattle Police Officer Lishner then asked Troyer if he knew why he was being arrested. Troyer responded, "Yes, escape from prison." Lishner asked why Troyer had escaped, and Troyer indicated that he had attempted to rape a sixty-year-old woman, and he was getting nervous because people were asking him questions about it. Troyer also stated that he had escaped from "prison" around September 1, 1988.

Troyer moved to have these statements suppressed, arguing that he never expressly waived his rights under *Miranda* prior to making these statements and these particular statements are more prejudicial than probative under Utah Rule of Evidence 403. The trial court entered an order suppressing "all incriminating statements made to any law enforcement officers involved in the extradition of Daniel Troyer." Although the trial court did not indicate its reason for suppressing these statements in its order, at a subsequent hearing, the trial court stated:

> [T]he reason [this evidence] was suppressed is twofold: One is, I don't think that a person can waive a constitutional right by silence, by omission. I think you have to have—I don't think it can be inferred from the record, is what I am saying. I think there must be something on the record to indicate a waiver of constitutional right, which there wasn't in this case.
>
> But secondly, I think this particular piece of evidence ... because of the ambiguous nature that whether he is referring to a previous time or whether he is referring to this time, if it comes into evidence, then he would be forced to try to explain it by telling about his previous

arrest, which is so prejudicial because the jury is likely to think, "Well, he has done it before, he probably did it this time, too," although that's really ... not very probative of whether he committed this particular crime. So it is a question of the prejudicial effect of the evidence weighed against the probative value.

Additionally, in the trial court's "Findings and Order of Dismissal," it stated that the decision to suppress these statements was based on

the extremely ambiguous nature of the statement by Troyer. It is not prejudicial in the sense an unequivocal admission of guilt would be, but it is prejudicial because it is highly ambiguous. Troyer was under suspicion some time earlier in a very similar crime. In fact, he had pled guilty to attempted rape of an elderly woman in 1979. The statement made to Officer Lishner could refer to the crime with which he is now charged, or one of the previous incidents. If the statement is admitted into evidence, Troyer would be forced to put on evidence of the previous investigations to explain the statement. These investigations are not otherwise relevant, and are highly prejudicial.

The State appeals, arguing that the trial court erred in suppressing these statements. Specifically, the State maintains that the trial court wholly failed to balance the probative value of these statements against their potential for undue prejudice under Utah Rule of Evidence 403. Also, the State argues that because the trial court did not specify rule 403 as the basis for its analysis, the trial court could not have engaged in an appropriate rule 403 balancing test. The State suggests that the trial court's statements regarding the probative value of this evidence are merely part and parcel of its *Miranda* waiver analysis.

The State, however, misconstrues the trial court's determination. While it is true that the trial court did not specifically term its analysis "a rule 403 analysis," a review of the record indicates that the trial court clearly employed rule 403 in making its decision. *See Hall v. Process Instruments & Control, Inc.,* 890 P.2d 1024, 1027 (Utah 1995) (stating

that exact language or terminology is not conclusive as to whether trial court employed correct analysis).

■ Utah Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If the evidence has an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury, we require a showing of unusual probative value before it is admissible under rule 403. *State v. Dunn,* 850 P.2d 1201, 1221–22 (Utah 1993); *State v. Lafferty,* 749 P.2d 1239, 1256 (Utah 1988). In reviewing a trial court's ruling on the admissibility of evidence under rule 403, we will not reverse the court's determination absent an abuse of discretion. *State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992); *State v. Verde,* 770 P.2d 116, 120 (Utah 1989). Thus, this court will not overturn a trial court's finding that the evidence was inadmissible under rule 403 unless it was "beyond the limits of reasonability." *Dunn,* 850 P.2d at 1221.

■ Here, the trial court indicated that the "evidence was suppressed pursuant to ... two legal bases." In enunciating one basis, the trial court stated that suppression was warranted because the prejudicial value of these statements far outweighed their probative value. Clearly, the statements the State sought to introduce have a strong propensity to unfairly mislead the jury. As the trial court correctly noted, it is unclear from these statements whether they refer to a prior crime or to Luckau's homicide, inasmuch as neither Luckau nor Troyer's prior victim was sixty years old. Furthermore, if Troyer were forced to explain his statements, it would necessitate references to a prior crime where he pleaded guilty to attempted rape of an elderly woman. This evidence would likely inflame the jury without providing any probative evidence as to whether Troyer murdered Luckau. Therefore, we conclude that the trial court justifiably found

these statements of slight probative value and highly prejudicial due to their ambiguous nature.

## V. DNA EVIDENCE

 The trial court's third suppression order disallowed any use of DNA evidence by the State. The State initially intended to introduce DNA evidence at trial. However, because the defense sought substantial discovery of all of the State's DNA testing materials and data, as well as payment of all costs incurred in securing a rebuttal expert for trial, the State initially decided to abandon its DNA evidence. At a status conference on April 27, 1990, the State made the following statement:

> This isn't the type of case, we have now decided, where the use of this DNA test really justifies the hassles that we are now jumping through the hoops we are jumping through, and therefore, we have elected and want the court to know today, we do not intend to use [our DNA expert]. There is no reason now for us to do these further DNA tests. There is no reason for them to bring this out of state expert in because we don't intend to use [our DNA expert] now.

Although the prosecutor stated that the State no longer intended to use its DNA expert, the trial court granted Troyer's discovery requests and allowed Troyer to continue exploring the use of DNA for exculpatory purposes.

Subsequently, on January 3, 1991, the prosecutor informed the trial court that the State intended to use DNA evidence in its case in chief. The State explained:

> Approximately a year ago we had some—what are called DNA type tests done in relation to this case, and we had indicated to the Court that we were going to use those. Defense indicated that they would need six some odd months to do an examination, so we agreed to withdraw [our DNA evidence] so we could get to trial faster. The Court however continued the trial for what's now been a year so [the defense] could have those tests done and [the defense] and I now have a misunderstanding as to what the State's position is.

> I want to make clear we do intend to use that evidence even though we have previously withdrawn it. The reason is, your Honor, the Court, by granting their continuance, I believe, went ahead and gave [the State] the impression that we could use that evidence, or at least that we have always understood we were going to use it because you went ahead and granted their six months continuance[.]

Troyer objected to the State's using this evidence because of its earlier abandonment of it and requested that the trial court suppress the State's use of such evidence. The trial court indicated that it would review the transcript of the April 27, 1990, hearing and issue its decision.

On January 22, 1991, the trial court issued an order which stated, "Based upon representations of the prosecutor made on April 27, 1990, the Court orders that the prosecutor will not be allowed to use evidence of DNA testimony in the trial of this matter." Later, the trial court reasoned:

> Because the prosecutor represented to defense counsel and to the Court that he did not intend to use the evidence, defense counsel proceeded to prepare the case without consideration of the DNA evidence, and it would be unfair and prejudicial to the rights of the defendant to allow the State to now change its position without any apparent reason, other than the prosecutor's change of mind. Its use at this late stage in the proceedings after an unequivocal commitment not to use the evidence would be a violation of due process.

On appeal, the State argues that the trial court erred in suppressing its DNA evidence because Troyer did not detrimentally rely on its assertion that DNA evidence would not be used at trial. To the contrary, argues the State, Troyer "continued, with the trial court's encouragement, to develop DNA evidence," and allowing the State to introduce its DNA evidence would not violate Troyer's due process rights.

In reviewing the propriety of this particular suppression order, we examine the doctrinal basis for judicial enforcement of govern-

mental promises made to an accused during the pendency of criminal charges against him. In 1971, the United States Supreme Court held that where a defendant reasonably relies on a governmental promise to his or her detriment, that promise must be fulfilled. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). Since then, a number of jurisdictions have followed the Supreme Court's lead. *See Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 296 (2d Cir.1976), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Correale v. United States,* 479 F.2d 944, 949–50 (1st Cir.1973); *United States v. Carter,* 454 F.2d 426, 427–28 (4th Cir.1972), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974); *Wilson v. United States,* 606 A.2d 1017, 1025–26 (D.C. 1992).

The focus of *Santobello* and its progeny is on the defendant's constitutional right to be treated with fairness throughout the process. For example, in *Rosser v. United States,* 381 A.2d 598 (D.C.1977), a prosecutor, in responding to a question by the trial judge as to whether the defendant had made any incriminating statements during his grand jury testimony, stated that all of the defendant's statements had been exculpatory. *Id.* at 600. At trial, however, the prosecutor impeached the defendant with an incriminating transcript of his grand jury testimony. *Id.* at 601. Although the defendant had not requested the statements during discovery, the court concluded that the prosecutor's representation eliminated the need for the defendant to make such a request, because " '[i]n open court, the court [and the defendant have] the right to rely on the truthfulness of the government's statement.' " *Id.* at 605 (quoting *United States v. Fallen,* 498 F.2d 172, 174 (8th Cir.1974)). Accordingly, the court reversed the defendant's conviction and remanded for a new trial. *Id.* at 610.

Similarly, in *Wilson v. United States,* 606 A.2d 1017 (D.C.1992), a prosecutor advised the trial court and the defendant that he knew of no impeachable prior convictions. *Id.* at 1019. However, during trial, the prosecutor disclosed that he intended to use prior convictions for impeachment purposes.

*Id.* The defendant argued that the prosecution's breach of promise "prejudiced [him] by causing him to forego opportunities to exercise peremptory challenges and to engage in plea negotiations, and was fundamentally unfair." *Id.* at 1019–20. The court found that the defendant had reasonably relied on the prosecutor's pretrial representations to the detriment of his exercise of peremptory challenges in selecting a jury and in his evaluation of whether to go to trial. *Id.* at 1027. Accordingly, the court reversed the judgment and remanded for a new trial. *Id.*

We now analyze the State's pretrial assurances that it would not use DNA evidence at trial. Central to our evaluation of this promise is the question of whether defendant detrimentally relied on the State's assertions and thus would be prejudiced by the State's introduction of DNA evidence.

Initially, we note that when the State represented that it was withdrawing its DNA test results from evidence, defendant did not similarly withdraw his motion for discovery of all the State's DNA testing data. The trial court granted defendant's discovery requests and ordered the State to provide all requested materials to defendant. Moreover, Troyer was granted a continuance for the very purpose of analyzing the DNA results. Over the next several months, the State provided the requested data to defendant. Troyer, however, maintains that he never pursued the DNA tests because of the State's assertion that it would not use such evidence.

We are not persuaded that Troyer's voluntary decision not to pursue the use of DNA testing—when he was given every opportunity and resource to do so—constitutes detrimental reliance sufficient to force the State to forego its DNA evidence. Upon the State's later request to reintroduce its evidence, the court granted Troyer yet another continuance. In the instant case, there clearly is no issue of surprise or lack of preparation. Moreover, given that Troyer is allowed to introduce his DNA evidence, it would be unfair not to provide the State with the same opportunity.

Accordingly, allowing the State to present DNA evidence at trial will not violate Troy-

er's right to a fair trial, nor will it implicate any other due process concerns. Therefore, we conclude that the trial court erred in suppressing the State's use of DNA evidence.[6]

## VI. TESTIMONY OF PRISON INMATES

 The trial court's fourth and final suppression order stems from the State's assurances that it would not use the testimony of prison inmates at trial. During the preliminary proceedings, the State moved to relocate Troyer from the Salt Lake County Jail to the Utah State Prison. Troyer, however, resisted this transfer because of concerns that information about the case could be obtained by other inmates at the prison and an inmate could then fabricate a confession attributable to Troyer. Nonetheless, on January 8, 1990, the trial court entered an order granting the State's request.

On January 24, 1990, Troyer petitioned the trial court for a hearing on the issue of whether he should continue to be housed at the prison. Troyer's petition was based on the fact that certain inmates had approached him with detailed information about his case and he was concerned that an inmate with access to such information would manufacture a confession implicating him. In support of its argument that Troyer should remain at the prison, the State assured the trial court and defendant that it did not have any informants planted at the prison and that it would not use prison inmates as witnesses at trial. Specifically, the State explained:

I want the record to be very clear, the State has no intention of using any informants or other people to testify in this case, that we have no desire whatsoever of obtaining new information by way of an admission or confession from this defendant to other inmates at the Utah State Prison. And if he is afraid about that the easy and simple solution is simply not talk to inmates about this case. But we are not going to use those inmates, your Honor. We don't have anybody out there. [Defendant's] memorandum implies we have got

some people out there that are working for us to get information about the case. That's not true at all. We don't care about what happens out there at the prison.

On the basis of the State's representations, the court ordered that Troyer remain in the prison.

Subsequently, the State indicated that it planned to use the testimony of prison inmate David Ray Coon at trial. Troyer moved to suppress this evidence on the basis of the State's prior assurances that it would not use such testimony. The trial court granted Troyer's motion, suppressing all testimony of any prison inmate and ordering that Troyer be moved from the prison back to the county jail. The trial court found:

[T]here is no evidence that [the State] was aware of these claims on January 26, 1990, or was involved in any way in "planting" these informants. Nevertheless, Troyer was maintained at the prison upon the representation of [the State] that informants' evidence would not be used, and that [its] case was based upon the evidence [it] had, and would not be based upon any evidence from informants at the prison. This was a decision intentionally made by [the State], and it would be unfair, and a violation of due process, to allow the State to now change its position and use the evidence.

On appeal, the State claims that the trial court erred in suppressing this testimony. Specifically, the State maintains that its prior statements were not "a blanket assertion that under no circumstances would the prosecution use inmate statements" but rather were only statements made in response to the allegations that the State had planted informants at the prison to extract information from Troyer. Moreover, the State argues that there is no due process violation because no evidence established that Troyer had relied on the prosecutor's statements.

Our analysis of this suppression order is governed by the same principles that controlled the State's prior assurances regarding DNA evidence. *See, e.g., Santobello v. New*

---

**6.** Because no other issues were raised as to the admissibility of the State's DNA evidence, we

make no determination concerning whether it may be found inadmissible on other grounds.

*York*, 404 U.S. 257, 262–63, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971); *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 296 (2d Cir.1976), *cert. dismissed*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Correale v. United States*, 479 F.2d 944, 949–50 (1st Cir.1973); *United States v. Carter*, 454 F.2d 426, 427–28 (4th Cir.1972), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974); *Wilson v. United States*, 606 A.2d 1017, 1025–26 (D.C.1992). This representation, however, requires a different result.

In reliance on the State's assurances that it would not use prison inmate testimony, Troyer decided not to pursue his motion for a transfer back to the county jail. By doing so, Troyer detrimentally relied on the State's assurances. In his petition to be moved from the prison to the county jail, Troyer expressed his fears that prison inmates would overhear information about his case, strike a deal with the State for their testimony, and testify to Troyer's "confession." These fears were realized the moment the State attempted to use testimony from prison inmates. However, on the basis of the State's representations, Troyer had not previously concerned himself with what appeared to be information leaks at the prison. Had Troyer not relied on the State's assurances, he and his counsel could have attempted to seal off any apparent information leak, and as the State suggested, Troyer presumably would have been more circumspect in his conversations with other prison inmates.

In addition, Troyer's reliance on the State's representations was reasonable. According to Troyer, the State, in making its representation, could have assumed that its strong case would only be weakened by putting prison inmates on the stand to testify. Such testimony would be vulnerable to cross-examination as to whether the inmate "made a deal" with the State in return for his testimony. Therefore, inasmuch as there was a rational reason for the State's assurance that it would not use such testimony, Troyer's reliance on those assurances was reasonable.

Also, the record indicates that without the State's assurances that it would not use such testimony, the trial court would likely have ordered that Troyer be relocated to the county jail. This is especially apparent given that the trial court specifically relied on the State's representations when it ruled that Troyer remain at the prison. Furthermore, when the State sought to use the testimony of prison inmates at trial, the trial court immediately ordered that Troyer be relocated to the county jail.

Because both defendant and the trial court detrimentally relied on the State's assurances that it would not use testimony of prison inmates at trial, we conclude that it would be fundamentally unfair and a violation of due process to allow the State to breach its promise. Accordingly, we conclude that the trial court did not err in suppressing this testimony.

## VII. CONCLUSION

We affirm the trial court's suppression of (1) the statements Troyer made to Seattle police officers and (2) the testimony of any and all prison inmates. However, we conclude that the trial court erred in (1) suppressing the testimony of Bonnie Troyer, (2) disallowing the introduction of Troyer's own statements for the limited purposes of impeachment, and (3) suppressing the State's use of DNA evidence. Accordingly, these rulings are reversed and remanded for further proceedings consistent with this opinion.

ZIMMERMAN, C.J., STEWART, Associate C.J., and HOWE and DURHAM, JJ., concur in Justice RUSSON's opinion.