**STATE of Utah, Plaintiff and Appellee,**

v.

**John Fletcher PENDERGRASS, Defendant and Appellant.**

**No. 900110–CA.**

Court of Appeals of Utah.

Dec. 7, 1990.

**1262**

Dale M. Dorius (argued), Dorius and Miller, Brigham City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., Christine F. Soltis (argued), Asst. Atty. Gen., for plaintiff and appellee.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

BENCH, Judge:

John F. Pendergrass appeals his conviction of murder in the second degree, a first-degree felony, in violation of Utah Code Ann. § 76–5–203 (1990).[1] We affirm.

On May 27, 1987, defendant joined the victim, Ray Jenkins, on an overnight fishing trip to Willard Bay. Among the items Jenkins packed was a .22 caliber revolver. Defendant and Jenkins were traveling in Jenkins's truck. They stopped at the home of an acquaintance who testified at trial that defendant kept asking Jenkins if he could borrow his truck to go to California. The acquaintance testified that Jenkins repeatedly answered no, using an "upset" voice.

Defendant and the victim allegedly consumed a large amount of mixed drugs and alcohol that day. Defendant claims to have consumed beer, marijuana, crystal methane, cocaine, and crack. Defendant, however, could not remember at what times he consumed the various drugs or the quantities.

There were twelve or thirteen people camping in the general area where defendant and Jenkins camped that evening. The closest campers were the Garrett family. They testified that during the evening there was a van and a car parked near Jenkins's truck. The family went to sleep at approximately 9:00 or 9:30 p.m. but were awakened by music and one person yelling at another person to stop singing. The music and yelling stopped; then Mr. and Mrs. Garrett heard gunshots. The music later resumed without any singing for a short period and then ceased altogether.

On the morning after the shooting, defendant, driving Jenkins's truck, picked up several of his friends and drove to a reservoir where they drank beer and whiskey and stabbed fish with samurai swords belonging to Jenkins. When asked about the truck, defendant stated that he had acquired the truck by trading a stolen car for it. Defendant told his friends that he was going to California and three of his friends decided to go with him. They then drove to California in Jenkins's truck. Defendant was later arrested in California for having a loaded firearm in a vehicle. Because there was an outstanding arrest warrant for forgery in Utah, defendant was returned to Utah.

1. Defendant was also convicted of theft of a motor vehicle and use of a firearm. He claims to appeal these convictions as well, but does not raise any issues unique to these convictions. Inasmuch as no issue is raised regarding these convictions separate from the issues raised regarding the second-degree murder conviction, we affirm these convictions without addressing them in detail. *State v. Carter*, 776 P.2d 886, 888 (Utah 1989).

The police who transported defendant back to Utah knew of Jenkins's disappearance and asked defendant where Jenkins was. Defendant told the officers that Jenkins had gone to California with him and was living in Oceanside. Once back in Utah, defendant provided three taped interviews to the police concerning the whereabouts of Jenkins.

At the first interview, defendant told police that Jenkins had shot himself while playing Russian roulette, and that Jenkins had only fired one shot. Defendant then put Jenkins in one of the sleeping bags and dumped the body and their camping gear in an area west of the shooting. After giving the statement, defendant took police to the Willard Bay area where he claimed to have dumped the body, but no body was found.

At the second interview, defendant repeated the same story until two police officers the defendant knew came out from behind a screen, at which time defendant broke down crying. He told the police that they would find two bullet holes in the body and "indicated very quietly that it was an accident." He did not explain how it was an accident, but he drew a map of where the body could be found. Again, no body was found.

At the third interview, the police discussed the inconsistencies of defendant's prior statements, in particular the statements relating to the number of bullet holes they would find. Defendant then reiterated his prior statement that Jenkins had shot himself in the head playing Russian roulette while sitting on the back of the truck. During this interview, however, he added that Jenkins then called out his name so defendant climbed in the back of the truck and put him out of his misery by shooting him in the head with the same gun that Jenkins had used. This time defendant drew a map and took the police to a different area of Willard Bay and the police recovered the body.

Jenkins's skeletonized body was found in his sleeping bag. Over it were placed large pieces of carpeting, wood, and foam which had been in the back of Jenkins's truck. Torn-off cattails were piled on top of the carpeting. Jenkins's pillow was found twelve to fifteen feet away. Jenkins had been shot twice in the head. It appeared that when Jenkins was shot he was in his sleeping bag with his head on his pillow. Two bullets were recovered from the pillow and two bullet holes were found in the sleeping bag. The two wounds were inflicted by two different small caliber guns,[2] apparently held in parallel position approximately nine to eighteen inches above Jenkins's head and fired simultaneously or in close succession.[3]

While being held in the Box Elder County Jail, awaiting trial, defendant told a fellow inmate that he shot Jenkins in the head twice and dragged him over to the weeds and covered him up with a sheet of plywood.

Defendant raises several issues on appeal: 1) the trial court erred in not instructing the jury on the lesser included offense of manslaughter; 2) the trial court erred in excluding expert testimony as to defendant's ability to form the requisite intent on the day of the murder; 3) the trial court erred in allowing an instruction to the jury concerning defendant's possible role as an

**2.** The State's ballistics expert concluded that two different guns were used because the riflings on each bullet recovered from the pillow were different; one bullet had a left-hand twist, and the other bullet had a right-hand twist. The gun in defendant's possession when he was arrested in California was a .25 caliber semi-automatic. No ballistics comparison was done, however, between that gun and the bullets found in Jenkins's pillow. Nor was any ballistics comparison done on Jenkins's .22 caliber revolver since it was never recovered.

**3.** According to the medical examiner, the shots were likely fired simultaneously or in close succession due to the parallel paths of the bullets. Had the shots been fired at different times, their paths would likely not have been parallel due to probable movement of the head following the first shot and the difficulty in lining up a parallel shot when it would be impossible to see both the entry and exit wounds of the first shot.

accomplice or accessory; 4) the trial court erred in preventing the defendant from testifying as to which parts of his testimony had been refreshed by hypnosis; and 5) the State failed to carry its burden of proof beyond a reasonable doubt. We will address each issue in turn.

## MANSLAUGHTER INSTRUCTION

Defendant claims that the trial court erred in not giving the jury an instruction on manslaughter as a lesser included offense. There is no question that manslaughter may be a lesser included offense of second-degree murder. *State v. Crick*, 675 P.2d 527, 529 (Utah 1983). There was no dispute on that issue below; rather, the issue was whether, based on the evidence, there was a rational basis on which the jury could acquit the defendant of the offense charged, second-degree murder, and convict him of a lesser offense, manslaughter.

██ Due process entitles a defendant to have the jury instructed on the theory of his case. *Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980); *State v. Oldroyd*, 685 P.2d 551, 555 (Utah 1984). This right, however, is not absolute; it is limited by the evidence presented at trial. *State v. Baker*, 671 P.2d 152, 157 (Utah 1983). Therefore, when a defendant requests an instruction on a lesser included offense, the trial court is only obligated to give the requested instruction when the evidence warrants such an instruction. *Id.* at 158–59. In other words, a defendant is only entitled to a requested instruction on a lesser included offense when there is a "sufficient quantum" of evidence to create a "rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *Id.* at 159. It is not sufficient that the evidence merely provide a basis for acquittal of the greater offense,

it must "simultaneously" provide a rational basis for the jury to convict of the lesser offense. *State v. Larocco*, 794 P.2d 460, 462 (Utah 1990); *accord State v. Shabata*, 678 P.2d 785, 790 (Utah 1984); *Crick*, 675 P.2d at 531. We conclude that the trial court correctly applied this standard in finding that there was no basis in the evidence for the instruction.

██ The trial court noted that to convict defendant of manslaughter, the jury would need to determine that defendant caused the death of Jenkins unlawfully and recklessly, and that he was aware of, but consciously disregarded, a substantial and unjustifiable risk with respect to the circumstances surrounding his conduct. The jury would also have to determine that defendant's disregard of the risk constituted a great deviation from the standard of care that an ordinary person would exercise under all the circumstances. *State v. Bolsinger*, 699 P.2d 1214, 1219–20 (Utah 1985); *State v. Fontana*, 680 P.2d 1042, 1045–46 (Utah 1984) (analyzing what constitutes depraved indifference for purposes of the second-degree murder statute as opposed to mere recklessness). The trial court asked defense counsel what evidence supported a theory that defendant acted recklessly. Defense counsel offered only defendant's statement to the police that it was an accident. The trial court correctly concluded that such a statement was legally insufficient to provide a basis for a manslaughter conviction because it did not, in any way, implicate defendant in the death of Jenkins. The mere statement that it was an accident does not show that defendant in any way caused Jenkins's death by accident. It only supports the theory that Jenkins died accidentally, whether by his own actions, by the acts of defendant, or by the acts of some third party.

Defendant himself testified that his defense was not that he acted recklessly, but that someone else shot Jenkins.[4] A man-

---

**4.** After being questioned about the amount of drugs the defendant had consumed, the following dialogue occurred:

Q. Well, your [sic] beginning to realize it's important that you consumed a lot. That's your defense, right?

slaughter instruction was therefore precluded by defendant's own theory of the case. *Shabata*, 678 P.2d at 790 (manslaughter instruction is inappropriate where the defense is that the defendant did not kill the victim); *Crick*, 675 P.2d at 534 (if jury believed defendant's denial of any involvement in killing, conviction on either the greater or lesser offense would be precluded). We therefore conclude it was not error for the trial court to refuse to give the jury an instruction on the lesser included charge of manslaughter.

## EXPERT TESTIMONY

Defendant claims that the trial court erred in not allowing two of his expert witnesses to testify. Defendant offered two experts who would have testified as to the effect the multiple drugs consumed by defendant would have had upon the defendant and his ability to form the requisite mental state for murder.

■ When addressing the admissibility of expert testimony, a trial court must determine whether there is a sufficient foundation for the expert's opinion. "The trial court is allowed considerable latitude of discretion in the admissibility of expert testimony, and in the absence of a clear showing of abuse, this court will not reverse." *Lamb v. Bangart*, 525 P.2d 602, 607–08 (Utah 1974); *accord State v. Schreuder*, 726 P.2d 1215, 1225 (Utah 1986); *State v. Clayton*, 646 P.2d 723, 726 (Utah 1982).

In the present case, defense counsel attempted to lay a proper foundation for the introduction of the testimony of its first expert witness, a clinical psychologist, by attempting to establish what drugs the defendant had consumed, the amounts of the drugs he consumed, when the drugs were consumed, the purity of the drugs consumed, and the defendant's level of tolerance for the drugs consumed. After several unsuccessful attempts to establish the foregoing, defense counsel conceded that he just could not give the trial court the quality or quantity of the drugs consumed. The State's objection to the expert testimony was then sustained and the witness was excused without giving his opinion. The defendant's next expert, a psychiatrist, was similarly dismissed after a failure to lay a sufficient foundation upon which he could testify.

The trial court held that defendant's expert witnesses were generally qualified to comment on the effect of drugs on an individual, but that any such opinion would be too speculative:

The rule of evidence relative to the reliable testimony of an expert does not allow speculation. Based on what I've heard here today, these two doctors are prepared to testify that—they are prepared to tell us that they can give an opinion relative to the defendant's state of mind between eleven and two o'clock. This court concludes that their testimony is nothing more than speculation. There [are] simply too many things they don't know about what the defendant's situation was between six o'clock and eleven o'clock. Including some of which are the amount of drugs involved. The amount of drugs consumed by this person as opposed to Mr. Jenkins or some other party who may have been there or whether they were consumed at all. The time period for which they were consumed. The purity or potency of drugs or the effect of poly-drugs poly-medications on the body. The court con-

A. No.
Q. But now you vaguely remember, right?
A. Yes, sir.
Q. You are smart enough to know that your defense in this case is one of being so intoxicated that you are trying to convince the jury you were so intoxicated that you didn't know what you were doing. You know that's your defense, don't you?

A. No, sir. My defense is that someone else came up that night and shot him.

When asked by his counsel if he killed Ray Jenkins, defendant responded:
A. No, sir, I didn't.
Q. You did not what?
A. Kill him. I didn't kill him.

cludes that testimony is unreliable. Is based on speculation. And so therefore, I'm going to sustain the objection.

■ A review of the record supports the trial court's conclusion. While there was testimony as to the types and total amounts of drugs in the possession of defendant and the victim on May 27, there was insufficient evidence as to the actual amounts consumed by defendant, the timing of the consumption, the purity of the drugs, and defendant's tolerance level. As the expert witnesses themselves acknowledged, all of the foregoing factors were necessary in order to form a reliable opinion as to the impact the multiple drugs would have had on defendant's ability to form the requisite intent. Inasmuch as the evidence was minimal to non-existent regarding the critical factors identified by the experts, the experts' opinions would have been based on mere assumptions. Therefore, it was not an abuse of discretion for the trial court to have excluded the expert testimony as being too speculative.

## ACCOMPLICE INSTRUCTION

The trial court allowed an instruction to the jury concerning whether defendant was guilty of being an accomplice or accessory to the death of Jenkins. Defendant claims that permitting such an instruction was error because no one else was charged with the crime and because the evidence did not support such an instruction.

■ · Defendant's claim that the instruction was error because no one else was ever charged with the murder of Jenkins is meritless in light of Utah Code Ann. § 76-2-203 (1990), which states:

In any prosecution in which an actor's criminal responsibility is based on the conduct of another, it is no defense:

. . . . .

(2) That the person for whose conduct the actor is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense or is immune from prosecution.

■ Defendant's other argument, that the evidence did not support an accessory or accomplice instruction, is equally without merit. The State's primary theory was that defendant had committed the crime of murder. In his own defense, defendant raised the possibility of other people being involved in the murder of Jenkins by introducing evidence that other people were in the area that night and that another vehicle had left the area that evening, supposedly after the shots were fired. The State's ballistics expert also testified that the bullets recovered came from two different guns. Based on the foregoing evidence, the jury could have concluded that more than one person was involved in Jenkins's death, or even that defendant did not directly cause Jenkins's death. But the jury could have also concluded that defendant's presence at the scene, his hiding of the body, his disposing of one of the murder weapons and his direct benefit by way of possession of Jenkins's truck and belongings, as well as his lying to his friends regarding how he acquired the truck, and his conflicting statements to the police, all negated his claim that he did not, at least to some degree, participate in the criminal episode. A jury instruction regarding accessories and accomplices was therefore appropriate. *See State v. McCardell,* 652 P.2d 942, 945 (Utah 1982) (aiding instruction proper where defendant was present when forged check was presented but defendant claimed that another had forged it).

## HYPNOTICALLY REFRESHED TESTIMONY

■ Defendant claims on appeal that it was reversible error for the trial court to prevent him from testifying as to which portions of his testimony had been refreshed by hypnosis, and to instruct the

jury concerning hypnotic testimony. Defendant cites *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), but misapplies its holding. In *Rock v. Arkansas*, the United States Supreme Court held that Arkansas could not prohibit hypnotically refreshed testimony per se because such a per se prohibition infringed upon the defendant's right to testify. The Supreme Court suggested several procedural safeguards to insulate hypnotically refreshed testimony from undue suggestion or pseudo-memory effects. Defendant requests on appeal that we remand for a determination of whether such safeguards were employed in the present case. Whether defendant's hypnotically refreshed testimony was properly admitted, however, was not an issue at trial. The trial court admitted defendant's testimony, natural as well as hypnotically refreshed, in its entirety. We therefore find no error under *Rock v. Arkansas*.

Defense counsel also argues on appeal that it was error for the trial court not to permit defendant to testify as to which portions of his testimony had been hypnotically refreshed. This issue, however, was not raised in a timely manner below. Absent an adequate objection at trial, the issue cannot be considered on appeal. *See State v. McCardell*, 652 P.2d 942, 947 (Utah 1982) (objection as to foundation did not direct trial court's attention to potential prejudice, therefore potential prejudice was not addressed on appeal). Even under the plain error rule we are not convinced that it was an obvious error for the trial court to refuse to permit defendant the opportunity to identify those portions of his testimony that were hypnotically refreshed. Defendant has also failed to show how this alleged error could have prejudiced his defense. *State v. Schreuder*, 712 P.2d 264, 275–76 (Utah 1985); *see also State v. Julian*, 771 P.2d 1061, 1063 (Utah 1989); *State v. Knight*, 734 P.2d 913, 921 (Utah 1987). We therefore reject defendant's claims on this issue.

## SUFFICIENCY OF EVIDENCE

Defendant claims that the State failed to carry its burden of proving every element of the offense beyond a reasonable doubt. Here the jury was fully advised as to each element of the offense charged. Murder in the second degree is defined in Utah Code Ann. § 76–5–203 (1990), which reads in relevant part:

(1) Criminal homicide constitutes murder in the second degree if the actor:

(a) intentionally or knowingly causes the death of another;

(b) intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; [or]

(c) acting under circumstances evidencing a depraved indifference to human life, he engages in conduct which creates a grave risk of death to another and thereby causes the death of another....

The standard of review when the sufficiency of the evidence in a jury trial is challenged is well-established.

[T]he evidence and the reasonable inferences which might be drawn therefrom must be viewed in the light most favorable to the jury verdict. A jury conviction is reversed for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Johnson,* 774 P.2d 1141, 1147 (Utah 1989) (citations omitted); *accord State v. Jonas,* 793 P.2d 902 (Utah Ct.App. 1990); *State v. Jamison,* 767 P.2d 134, 137 (Utah Ct.App.1989).

We defer to the jury because a jury is in the best position to give "proper weight to the peripheral nature of [any] contradictory testimony," *State v. Lactod,* 761 P.2d 23, 28 (Utah Ct.App.1988),

It is not this court's duty to measure conflicting evidence or the credibility of witnesses. That responsibility belongs strictly to the trier of fact. " 'It is the exclusive function of the jury to weigh

the evidence and determine the credibility of the witnesses.' So long as there is some evidence, including reasonable inferences, from which findings of all requisite elements of the crime can reasonably be made, our inquiry stops."

*Id.* at 27 (quoting *State v. Booker*, 709 P.2d 342, 345 (Utah 1985) (citations omitted)); *accord State v. Hopkins*, 782 P.2d 475 (Utah 1989) (an appellate court "does not have the prerogative to substitute its judgment on the credibility of witnesses for that of the fact finder").

Viewing the evidence in a light most favorable to the jury's verdict, there was sufficient evidence that defendant killed Jenkins. By defendant's own testimony, he was with the victim at the time of his death. The unrefuted evidence established that prior to going to Willard Bay, defendant and the victim argued about defendant taking Jenkins's truck to California. During the night, the Garretts heard yelling and gunshots from the direction of defendant's camp. The next morning, defendant hid the victim's body and all the evidence of the crime. While hiding the body, defendant threw the victim's gun into Willard Bay and it was never recovered. Rather than report what had happened, defendant proceeded to take the victim's truck and partied with friends, lying to them about how he acquired the truck. Defendant then took the victim's truck to California. When questioned by the police as to the whereabouts of Jenkins, defendant gave several false accounts of what happened. Prior to the police locating the body, defendant told the police that Jenkins had been shot twice, a fact that would not have been readily apparent without looking closely at the body after the shooting unless one already knew that the victim had been shot twice. Defendant admitted to the police, although he later stated that his admission was a lie, that he had shot the victim to put him out of his misery after the victim had shot himself playing Russian roulette. He also admitted to at least one fellow inmate at the Box Elder County Jail that he killed Jenkins.

The only evidence that defendant can point to in support of his theory that someone else shot Jenkins is that other people were in the area, two weapons were used, and a car left the area sometime that evening. As to the use of two weapons, a reasonable inference would be that defendant fired both guns. As to the car leaving, Mr. Garrett heard a car leave after the gunshots but could not state whether the car left the area of defendant's camp. Mrs. Garrett did not hear the car at all. Garrett's young son did see the headlights of a car as it left but did not hear the gunshots and therefore did not know if it left before or after the gunshots. The son also testified that the car left from the area where the Garretts were camping and not from the area of the victim's campsite.

The jury was free to give this testimony the weight it deemed proper. The evidence in its totality, however, was not "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Johnson*, 774 P.2d at 1147. We therefore find that the jury verdict is adequately supported by the evidence.

Defendant's conviction is affirmed.

GARFF and JACKSON, JJ., concur.