**STATE of Utah, Plaintiff and Appellee,**

v.

**Thomas M. VIGIL, Defendant and Appellant.**

**No. 940614–CA.**

Court of Appeals of Utah.

July 5, 1996.

Patrick L. Anderson, Salt Lake City, for Appellant.

Jan Graham and Todd A. Utzinger, Salt Lake City, for Appellee.

Before DAVIS, BILLINGS, and WILKINS, JJ.

## OPINION

DAVIS, Associate Presiding Judge:

Defendant Thomas M. Vigil appeals a jury verdict convicting him of three counts of theft by deception, one third degree felony and two second degree felonies, in violation of Utah Code Ann. § 76-6-405 (1995). We affirm.

## I. FACTS

■ Defendant is appealing from a jury verdict; thus we recite the facts in a light most favorable to the jury's verdict, "but present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Winward*, 909 P.2d 909, 910 (Utah App.1995).

### A. The Elizondos

In early November 1992, John Giffen, an adoption attorney in St. George, Utah, received a phone call from defendant's wife, Tonya Vigil, a co-defendant in this case. Tonya informed Giffen that she was expecting a child March 27, 1993, and that she and defendant, the child's father, wished to place the baby for adoption. Giffen explained to Tonya the procedure for a private adoption and offered to have Saunya Schuchart, his paralegal who resided in Salt Lake City where the Vigil's were living, meet with her and show her several "resumes" [1] of potential adoptive families.

Schuchart met with defendant and his wife at a local restaurant, provided them with the resumes, and explained the adoption process. The Vigils chose Frank and Stephanie Elizondo, a California couple, from the resumes as the prospective adoptive parents. At this meeting, defendant asked Schuchart whether the Vigils could receive financial assistance for living and medical expenses during the pregnancy. Schuchart assured him that they could.

After the Vigils had chosen the Elizondos as the adoptive parents, Frank Elizondo contacted Tonya by phone. The two conversed to get acquainted. At this time, Frank agreed to send Giffen money to assist the Vigils with their living expenses. Because neither defendant nor Tonya were working, the Elizondos agreed to pay for their living expenses until defendant found employment. At that time, the financial assistance would be reduced by the amount defendant was earning. Giffen would deposit the money received from Frank into a trust account, which would then be used to assist the Vigils when needed. Either defendant or Tonya would call Schuchart and request money; she would then contact Giffen. Giffen would transfer Frank's money into a Salt Lake City bank account from which Schuchart could draw the necessary amount.[2] Frank initially forwarded $1200 on November 5th to help defendant and Tonya get into an apartment.

After the initial meeting, Schuchart again met with the Vigils when defendant called requesting that she assist them in locating an apartment. An apartment was found and Schuchart gave defendant two checks, presumably to cover rent. However, Tonya called Schuchart one or two days later and told her defendant had left and taken the checks without paying for the apartment. Schuchart stopped payment on the checks.

Schuchart did not hear from the Vigils for approximately two and a half weeks. When Tonya finally made contact with Schuchart, Schuchart again helped the two find an apartment. Because of the Vigils' poor credit history, the landlord required Giffen to personally guarantee rent for four months.

---

1. The "resumes" are pictures and biographical sketches of the couples attempting to adopt a child.

2. All checks were made payable to Tonya, not defendant.

Giffen met with the Vigils in either late November or early December. Along with a medical record release form, Giffen had the Vigils sign a "Waiver of Consent of Interest." Giffen explained that because he represents both the Elizondos and the Vigils, there was a potential conflict of interest and, therefore, he needed to get their permission to represent both parties. Giffen also discussed a document with the Vigils entitled "The Illegality Pitfalls in Adoptions." The document informs birth parents what they can and cannot do regarding the adoption. Giffen advised the Vigils that receiving money from adoptive parents for pregnancy related expenses did not mean that consent for the adoption had to be given. Additionally, Giffen told them it was illegal to take money from an adoptive couple if they did not intend to go through with the adoption and it was illegal for the birth parents to take money from more than one prospective adoptive couple. Although the document covered California law, Giffen told the Vigils that Utah had the same type of laws. Both defendant and Tonya signed this document.

In the middle of December, Giffen received a phone call from defendant, who requested that Giffen pay him the rent for January early so that he and Tonya could buy "Christmas presents, and clothes and things." Defendant assured Giffen he would take·care of the January rent himself if Giffen would release the funds. Based on this conversation, Giffen sent $375 on December 11th and $125 on December 14th to cover the holiday expenses. Notwithstanding defendant's promise, the Vigils failed to pay January's rent, which was ultimately paid a second time by the Elizondos.

During the middle of February 1993, the Elizondos visited the Vigils in Salt Lake City. Schuchart picked the Elizondos up at the airport and dropped them off at the Vigils' apartment. The four went to lunch and after some sightseeing, Tonya suggested they visit the hospital maternity ward where she anticipated the baby would be born. Tonya also gave Stephanie a baby blanket which a friend

had made for Tonya's baby. Defendant then dropped the Elizondos off at the airport. Both Frank and Tonya testified the visit went well.

After this visit, Frank received a phone call from defendant, who requested that Frank start sending the money directly to defendant, bypassing Giffen. Defendant also requested that Frank change attorneys, stating he was not happy with Giffen because defendant wanted to control the money and Giffen did not allow it. Frank told defendant he was bound contractually to Giffen and could not change attorneys. Subsequent to this conversation, defendant called Frank again and requested $1500 to buy a car. Frank told defendant that he did not have that kind of money and, in any event, the money had to go through Giffen and had to be for pregnancy related items. Defendant became angry and told Frank not to tell Giffen about the request.

Toward the end of February, Giffen received another phone call from defendant. Defendant again requested that the March rent be sent early and that it be sent directly to defendant, as opposed to the landlord. Giffen resisted and defendant hung up on him. Defendant called again the next day, insisting that he needed the money. Giffen relented and had Schuchart write a check to Tonya, which was done on February 24th. A few short weeks after this transaction took place, defendant again called Giffen stating that he needed money for the March rent.[3] After Giffen reminded defendant that they had already paid rent for March, defendant replied that he spent the money on his car. When Giffen told defendant he did not think they could pay the rent again, defendant got angry and hung up on Giffen. Giffen spoke with Frank, who again sent money to cover the rent for March.

Frank continued to call the Vigils numerous times a week to check on Tonya's status. Although he was able to talk to Tonya a few times, the majority of the conversations were with defendant, who told Frank that Tonya was resting. Toward the middle of March,

---

3. Giffen also received a phone call from the landlord complaining that the March rent had not been paid.

Frank began calling almost every day, anxious about the baby's arrival. Frank had discussed with the Vigils the arrangements for picking up the baby; when Tonya went into labor, either she or defendant was to call Frank. As soon as Frank received word, he and Stephanie would take the next flight into Salt Lake City and meet the Vigils at the hospital.

At one point, Frank was unable to reach either defendant or Tonya for a full day.[4] Anticipating that Tonya had gone into labor, Frank called the hospital, where he talked to defendant. Defendant assured Frank that Tonya was only there for a routine check-up. Frank called again the following Monday and spoke to defendant. Defendant told Frank that Tonya was resting. When Frank asked defendant when Tonya's next doctor appointment was, defendant replied that it was Tuesday. Frank phoned again on Tuesday and defendant stated that the appointment had been moved to Wednesday. When Frank called on Wednesday, he discovered that the Vigils' phone had been disconnected.

The last conversation Giffen had with defendant was on or about March 18th. Defendant called Giffen and told him that they had not paid their utility bills for several months and, as a result, the utility companies were threatening to turn them off. Giffen had Schuchart confirm this with the utility companies, and the Elizondos ultimately paid for the phone and electric bill. Schuchart issued a check to the Vigils on March 18th for $150 to cover groceries. On the same day, Schuchart wrote a check to the phone company, stuck the check in the envelope with the bill, sealing it. Schuchart also deposited $250 with the landlord on March 19th for a cleaning fee deposit.

After delivering this money to the Vigils, Schuchart received a phone call from Frank, who asked that she investigate why the phone had been disconnected. Schuchart, knowing that she had just paid the phone bill, went over to the apartment on the Thursday following Frank's last phone call to the Vigils, where defendant let her in. After approximately 20 minutes, defendant brought out a newborn baby girl and introduced her as Alexandria. Defendant informed Schuchart that he and Tonya had decided to keep the baby. When Schuchart asked when the baby was born, defendant said that she was born two days ago.[5] After learning this, Schuchart informed Frank. The Elizondos had paid approximately $4300[6] toward the Vigils' living expenses during Tonya's pregnancy.

### B. The Bushmans

Rex Bushman, an attorney who occasionally assists with adoptions, received a phone call from Tonya asking if Bushman was an adoption attorney. Tonya made an appointment with Bushman and, on February 24, 1993, the Vigils met with him at his office. The Vigils expressed their desire to find a couple to adopt their unborn child. Bushman replied that he and his wife would like to adopt a baby. Although they already had four children, they wished to have more and were unable to. Both defendant and Tonya stated they were amenable to this idea. The Vigils did not inform Bushman that they were receiving money from the Elizondos or that they had been working with Giffen.

At this initial meeting, Bushman had the Vigils sign an agreement stating that Bushman would find a suitable family to adopt the baby. Additionally, because the Vigils had said they were unable to pay for the medical expenses concerning the birth of the child, Bushman offered to pay the costs associated therewith.

The three met again on March 5th at Bushman's office. At this time, two more agreements were entered into. The first concerned an agreement that if the adoption

---

4. The date and/or the day of the week is unclear.

5. The baby was born on March 18, 1993.

6. The Elizondos sent $1200 on November 5th, 1992, approximately $1000 in December for January's rent, $375 for rent and $50 for clothes on February 1st, $100 for utilities on February 18th, $500 for rent and other expenses on February 24th, $500 for rent and utilities on March 8th, $50 for clothing on or about March 10th, $150 for food and $82.24 for the phone bill on March 18th, and $250 for the cleaning deposit on March 19th.

did not go through, the Vigils would reimburse Bushman the expenses he had paid them. The second document was a "Waiver of Conflict of Interest." Perceiving a potential conflict because he was one of the adopting parents and also the attorney representing the Vigils, Bushman explained this fact to the Vigils and had them sign the waiver.

Prior to the March 5th meeting, Bushman received a call from defendant stating that he and Tonya needed some assistance with living expenses. Bushman requested that defendant determine how much he needed and call him back. Defendant did so, informing Bushman that they needed $1500 to cover rent, utilities, and groceries.

When the Vigils met with Bushman on March 5th, he had prepared another document reflecting the parties' agreement that he was giving them $500 for living expenses [7] and would give them a balance of $1000 after the baby was born and the Vigils gave their consent for the adoption.

Bushman remained in contact with the Vigils after the March 5th meeting, expecting the baby to be born soon. On or after March 19th, Bushman called the Vigils and spoke with Tonya. Tonya assured Bushman at this time that the adoption would still proceed as agreed, never revealing that the baby had been born on March 18th or that they had decided to keep the baby. When Bushman tried to contact the Vigils again, he discovered that their phone had been disconnected.

### C. The Hallidays

Marilyn Fineshriber, an attorney who has a limited practice in the adoption area, received a phone call from Tonya on either March 3rd or 4th of 1993. Tonya asked Fineshriber general questions regarding the adoption procedure and stated that she was expecting and was interested in placing her baby for adoption. Tonya made an appointment with Fineshriber to discuss the matter further.

The parties met on or about March 7th. They discussed the type of adoptive family with whom the Vigils were interested in placing their baby, the financial aid this family may be able to give the Vigils, and the Vigils' medical background. Fineshriber was told that the baby was due March 28th. Neither defendant nor Tonya mentioned to Fineshriber that they were receiving money from two other couples in connection with the baby's adoption.

After the initial meeting, Fineshriber spoke with Paul and Vicki Halliday concerning their interest in adopting the Vigils' baby. After the Hallidays expressed a desire to adopt the baby, Fineshriber informed the Vigils, who agreed to the adoption. The Hallidays gave the Vigils $900 on March 12th to help them with living expenses [8] and agreed to pay them $600 in April after the baby was born. Both defendant and Tonya picked up the check at Fineshriber's office.

After March 12th, Fineshriber spoke on the phone with both defendant and Tonya several times concerning how Tonya was feeling, her due date, and doctor visits. Fineshriber spoke with Tonya on March 23rd, and at this point Tonya did not inform Fineshriber that the baby had been born, but said only that the adoption would go forward as scheduled.

On March 25th, defendant contacted Fineshriber and told her that they needed more money because the phone had been disconnected and they were behind in paying their other utilities. Fineshriber asked defendant if they still planned to proceed with the adoption because that was the only way the money would be available. Defendant assured her that they were, but did not mention that the baby had been born. Fineshriber spoke with the Hallidays, who agreed to give the Vigils an additional $600. Defendant picked up this check on March 26th.

After defendant picked up the check on March 26th, Fineshriber attempted to con-

---

**7.** Bushman gave them two checks; one for $390 for rent and another for $110 for utilities and/or groceries. This was the third check the Vigils received for their March rent.

**8.** The Vigils had told Fineshriber that because they were unable to afford their March rent, they were about to be evicted.

tact the Vigils, but was unable to because their phone had been disconnected. Fineshriber did not speak with the Vigils again until the end of March or first of April, when defendant called and told Fineshriber that they had decided not to go through with the adoption but that they had not intended to deceive anyone. At this time, defendant told Fineshriber that they had been receiving money from the Elizondos.

In August 1993, defendant was charged by information on three counts of theft by deception, in violation of Utah Code Ann. § 76–6–405 (1995). A trial was held in April 1994.

Tonya testified to the events surrounding the adoption. Although she was satisfied with the Elizondos as prospective parents, Tonya testified that she became dissatisfied with Giffen and Schuchart. Tonya stated that she wanted the Elizondos to have the baby, but because they could not switch attorneys, she decided she could not go through with the adoption. This decision was made shortly after the Elizondos visited Salt Lake City. Tonya did not inform the Elizondos, Giffen, or Schuchart of this decision. Furthermore, even though she had decided not to go through with the adoption with the Elizondos, Tonya testified that they continued to solicit funds from them.

Tonya stated that after she decided she was not going to continue the adoptive relationship with the Elizondos, she looked in the yellow pages for another adoption attorney. Although she agreed with Bushman's testimony that they had agreed to let Bushman adopt their baby, she stated that he later changed his mind and said he would find a family after the baby was born. Dissatisfied with this arrangement, Tonya went looking for another attorney.[9]

Tonya then spoke with Fineshriber regarding the possible adoption and ultimately agreed to have the Hallidays adopt the baby. Although Tonya testified that she was prepared to let the Hallidays adopt the baby, after the baby was born on March 18th, she decided she could not give the baby up for adoption. Tonya stated that she did not talk to any of the adoptive parents or attorneys

after the baby was born and did not call any of them to inform them of the birth. When asked why she did not return the money received from Fineshriber after the baby was born, Tonya replied, "I didn't have a phone and I just had a baby and I just know I didn't."

The jury convicted defendant on all three counts. Defendant appeals.

## II. ISSUES

Defendant raises numerous issues on appeal: whether (1) the trial court erred by concluding that theft by deception occurs in an adoption context; (2) the trial court adequately conducted voir dire; (3) the trial court erred by excluding defendant's evidence; (4) the trial court erred by refusing to give two of defendant's proposed instructions to the jury; and (5) defendant's trial counsel was ineffective by failing to request a jury instruction regarding possible statutory defenses to theft by deception or, if we determine that defendant's trial counsel was not ineffective, whether the trial court committed plain error by not submitting the instructions to the jury sua sponte. Defendant does not challenge the sufficiency of the evidence.

## III. ANALYSIS

### A. Theft By Deception in the Adoption Context

■ We begin our analysis by addressing defendant's claim on appeal that theft by deception, as codified at Utah Code Ann. § 76–6–405 (1995), cannot, as a matter of law, occur in adoption proceedings. Because theft by deception cannot occur in an adoption setting, defendant argues, the trial court erroneously instructed the jury on that issue. Whether the trial court properly determined and instructed the jury that theft by deception can occur in adoption settings are questions of law, which we review for correctness, giving the trial court no particular deference. *State v. Ontiveros*, 835 P.2d 201, 205 (Utah App.1992).

9. However, Tonya testified that she did not learn of Bushman's change of heart until their second

meeting, which was March 5th. Tonya called Fineshriber on either March 3rd or 4th.

Defendant's argument is premised on the juxtaposition of the statutory language for theft by deception and payment of adoption expenses. Theft by deception is statutorily defined as follows:

(1) A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof.

(2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance....

Utah Code Ann. § 76–6–405 (1995).[10]

Section 76–7–203, which forbids the sale of children but permits the payment of pregnancy-related expenses, provides:

Any person, while having custody, care, control, or possession of any child, who sells, or disposes of, or attempts to sell or dispose of, any child for and in consideration of the payment of money or other thing of value is guilty of a felony of the third degree. However, this section does not prohibit any person, agency, or corporation from paying the actual and reasonable legal expenses, maternity expenses, related medical or hospital, and necessary living expenses of the mother preceding and during confinement as an act of charity, so long as payment is not made for the purpose of inducing the mother, parent, or legal guardian to place the child for adoption, consent to an adoption, or cooperate in the completion of an adoption.

*Id.* § 76–7–203 (1995).

Defendant first argues that because the money given to the birth parents is considered a charitable contribution pursuant to section 76–7–203, and not consideration for the birth parents' promise to place the child for adoption, there can be no reliance, an essential element of theft by deception, by the prospective adoptive parents which would induce them to part with their money. Secondly, according to defendant, as a matter of law "[t]he birth parents cannot purvey any deception, because the object of their representations, the baby, cannot be sold, and thus

has no pecuniary significance." Furthermore, since the funds given the birth parents are charitable contributions, they similarly have no pecuniary significance. We find defendant's arguments unpersuasive.

The statutory definition of deception is found at section 76–6–401(5) of the Utah Code which, in pertinent part, provides,

(5) "Deception" occurs when a person intentionally:

(a) Creates or confirms by words or conduct an impression of ... fact that is false and that the actor does not believe to be true and that is likely to affect the judgment of another in the transaction; or

....

(e) Promises performance that is likely to affect the judgment of another in the transaction, which performance the actor does not intend to perform or knows will not be performed; provided however, that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

*Id.* § 76–6–401(5) (1995).

■ This court has previously enumerated three separate components of the deception element:

(1) that defendant's acts satisfied the statutory definition of deception, (2) that the deception occurred contemporaneously with the transaction in question, and (3) that the victim relied upon the deception, at least to some extent, in parting with property.

*State v. LeFevre,* 825 P.2d 681, 685 (Utah App.), *cert. denied,* 843 P.2d 1042 (Utah 1992).

■ Defendant is correct in stating that prospective adoptive couples cannot be guaranteed that the birth parents will give up the baby for adoption when they agree to pay for expenses, because any funds given to the birth parents cannot be used to induce them into consenting to the adoption, but can only, by law, be considered a charitable contribu-

---

**10.** The jury instructions numbered 20, 22, and 24 set out the elements of theft by deception. The statutory definition of deception was set out in instruction number 26.

tion. *See* Utah Code Ann. § 76–7–203 (1995); *cf. State v. Lakey*, 659 P.2d 1061, 1063 (Utah 1983) ("an unfulfilled promise of future performance will not suffice as a false representation of fact"). However, defendant's claim that adoptive parents cannot rely on the birth parents' present intent to place the baby for adoption, even though legally revocable in the future, is misplaced.[11] To the contrary, " '[t]he [statement of future conduct] is regarded as a representation of a present intention to perform. Hence, such a [statement], made by one not intending to perform operates as a misrepresentation—a misrepresentation of the speaker's state of mind, at the time, and is actionable as a misrepresentation of "fact." ' " *Conder v. A.L. Williams & Assocs.*, 739 P.2d 634, 640 (Utah App.1987) (citation omitted);[12] *see also, Lakey*, 659 P.2d at 1064 (stating section 76–6–401(5) "specifies circumstances in which a promise of future performance can be an element of the crime" of theft by deception). Thus, the adoptive parents are entitled to rely on the birth parents' representations of their present intent to place the baby for adoption, even though this decision is revocable. If, at the time they obtained funds from the prospective adoptive parents, the birth parents did not intend to place the baby for adoption, they fall within the definition of deception, because the promised performance—to give the baby up for adoption— which the birth parents knew to be false at the time they made the promise, affected the judgment of the adoptive parents when they decided to pay expenses to the birth parents. Quite clearly, prospective adoptive parents would not part with their money knowing that, at the time the money is paid, the birth parents do not intend to give the baby up for adoption.

Defendant also claims that because the child is the object of his alleged misrepresentations, and by law a baby cannot be sold, any funds given to the birth parents are considered charitable contributions. There-

fore, defendant asserts the representations have no pecuniary significance, *see* Utah Code Ann. § 76–6–405 (1995), and defendant cannot be found guilty of theft by deception as a matter of law. Defendant's argument is meritless. Although the child is the "bait" used, the false representations of the birth parents regarding their present intent to place the child for adoption have substantial pecuniary significance: the resulting financial support from the prospective adoptive parents, whether characterized as a charitable contribution or not.

Finally, it is important to note that section 76–7–203 prohibits the payment of money to *induce* the *"mother, parent, or legal guardian to place the child for adoption."* Utah Code Ann. § 76–7–203 (1995) (emphasis added). Thus, there is no conflict between sections 76–7–203 and 76–6–405 where, as here, the inducement was the false representation made *by* the "parents" *to* the prospective adoptive parents. Thus, the outcome defendant urges, to allow birth parents to collect money from unsuspecting potential adoptive parents based on their false representations, is absurd. Birth parents would be legally allowed to falsely induce persons who are trying to adopt into paying their medical expenses, living expenses, and maternity expenses. This is certainly not the result contemplated by section 76–7–203.

Accordingly, we hold the trial court did not err in concluding that theft by deception can occur in an adoption setting and, therefore, properly instructed the jury on this issue.

### B. Voir Dire

Defendant challenges two aspects of the trial court's voir dire. Defendant first claims the trial court erred in refusing to ask two questions proposed by defendant. Secondly, defendant claims the trial court committed error in refusing to conduct further voir dire of two potential jurors when they acknowl-

---

**11.** Defendant's claim is also contradictory to the position he took at trial. Defendant proposed an instruction which essentially stated that accepting money from prospective adoptive parents does not "subject [defendant] to criminal responsibility *unless ... [defendant] never had the inten-*

*tion of consenting to the adoption of the child."* (Emphasis added.)

**12.** Although *Conder* was a civil fraud case, we find the analysis to be persuasive in the criminal theft by deception context.

edged exposure to media regarding failed adoptions.

We review defendant's challenge to the trial court's voir dire for an abuse of discretion. *Barrett v. Peterson*, 868 P.2d 96, 98 (Utah App.1993). Although the trial court is afforded broad discretion during voir dire, the " 'discretion must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors.' " *Id.* (quoting *State v. Hall*, 797 P.2d 470, 472 (Utah App.), *cert. denied*, 804 P.2d 1232 (Utah 1990)). We will not disturb "a trial court's discretionary rejection of voir dire questions" unless the trial court abused its discretion and the abuse " 'rose to the level of reversible error.' " *Id.* (quoting *Hall*, 797 P.2d at 472). Reversible error occurs when, after reviewing the totality of the questioning, we conclude that trial counsel was not given " ' "an adequate opportunity to gain the information necessary to evaluate jurors." ' " *Id.* (quoting *Evans v. Doty*, 824 P.2d 460, 462 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992) (quoting *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988))). There are two purposes behind voir dire. The process first allows trial counsel to discover any biases an individual juror may have which would support a challenge for cause. *Evans*, 824 P.2d at 462. Voir dire also allows counsel to gather sufficient information to allow them to intelligently exercise a peremptory challenge. *Id.*

After the trial court had completed the first round of voir dire, counsel was given the opportunity to state their objections and request further questions. Defendant requested that the trial court ask his proposed questions numbered twenty-seven and twenty-eight. Question twenty-seven stated:

If, after hearing the evidence you came to the conclusion that the prosecution had not proven the guilt of the accused beyond a reasonable doubt, and you found that a majority of the jurors believed the defendant was guilty, would you change your verdict only because you were in the minority?

Question twenty-eight stated:

Are there any of you who are not in such a fair and impartial state of mind that you would not be satisfied to have a juror possessing your mental state judge the evidence if you or your loved ones were on trial here? In other words, would you want someone with your state of mind sitting as a juror on a case if you were the defendant?

The trial court refused to ask the proposed questions, stating "the Court is satisfied that it has covered that matter in substance and the questions have been put to the panel."

Defendant claims that, considering the " 'totality of the questioning,' . . . this Court can see that the trial court abused its discretion in failing to ask these two questions, because voir dire never addressed whether the prospective jurors felt that they were generally fair and impartial, and whether they would maintain their independence in the deliberation process, or succumb to pressure from a majority." However, defendant has not claimed the trial court's refusal to ask questions twenty-seven and twenty-eight denied him " 'an adequate opportunity to gain the information necessary to evaluate [the] jurors,' " *Barrett*, 868 P.2d at 98 (citation omitted), or prevented him from either exercising a peremptory challenge or discerning any bias on behalf of a potential juror supporting a for-cause challenge. *See Evans*, 824 P.2d at 462. Defendant merely asserts the trial court abused its discretion by not putting the question to the prospective jurors. Without any analysis on the issue, we fail to see the basis of defendant's contention.[13] It is well settled that an appellate court is not " 'a depository in which the appealing party may dump the burden of argument and research.' " *State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (citation omitted); *see also* Utah R.App.P. 24(a)(9) ("[t]he argument *shall* contain the contentions and

---

13. In his reply brief, defendant argues the legal authority cited in the introductory section to his voir dire argument fulfilled his briefing obligation. However, citing cases regarding the general law of voir dire does not form the basis of a legal argument sufficient to put this court on notice of the grounds of a party's complaint. *See* Utah R.App. P. 24(a)(9) ("[t]he argument *shall* contain the contentions and reasons of the appellant with respect to the issues presented") (emphasis added).

reasons of the appellant with respect to the issues presented") (emphasis added). Thus, even if defendant's argument had merit, because defendant did not clearly analyze the issue, we decline to address it on appeal.

██ Defendant next argues the trial court abused its discretion when it failed to further question two jurors who said they had been exposed to media coverage in response to the following question: "Have any of you see[n] any recent television programs, or received other information, depicting attempted adoptions? What did you hear?" After the question was posed to the potential jurors, several raised their hands. Two potential jurors, Wylie and Reese, answered "yes" to the question and ultimately served on the jury.

The colloquy between Wylie and the trial court was as follows:

The Court: ... And Ms. Wylie, what program was it?

Ms. Wylie: I don't know. Just a documentary.

The Court: How long ago was that?

Ms. Wylie: Within six months and then in the Ladies Home Journal I think there was an article too.

The Court: Do you recall the subject matter of the documentary or the article in the Ladies Home Journal?

Ms. Wylie: I just know its adoption and then they changed their mind.

The Court: Was that the subject matter of those issues?

Ms. Wylie: Uh-huh.

The Court: Let me ask you this question, Ms. Wylie. As a result of the documentary or the article in the magazine, and considering the nature of today's case, would any of that information interfere with your responsibility to be fair and impartial?

Ms. Wylie: No, not really.

The Court: You are certain you could remain fair and impartial to both sides of this story?

Ms. Wylie: I think, yes.

The Court: Obviously, you use the word "think." Do you have a hesitation?

Ms. Wylie: I don't remember the story in that detail, you know. I think I can listen impartially.

The following dialogue occurred between the trial court and Reese:

Ms. Reese: ... I watched a television program documentary within the last three months "Attempted Adoption."

The Court: Do you remember the thrust or major points of the program you saw?

Ms. Reese: The major thing was that the child was up for adoption and then their minds were changed and the natural parents got the child back.

The Court: Would any of that information interfere with your abilities to be fair and impartial to both sides of this lawsuit, Ms. Reese?

Ms. Reese: No.

Defendant's counsel objected to the trial court's refusal to question jurors Reese and Wylie further, stating, "I felt that we needed to question them further regarding what the program was they saw and how they felt about it." The court, however, was "of the opinion that the totality of the questions put to all of the panel members, as well as those two panel members in particular, was appropriate and sufficient." We agree.

Not only was the basis of defendant's objection covered in the colloquy between the court and Reese and Wylie, but the trial court persevered in its line of questioning to ensure that the two would be fair and impartial. This taken together with other voir dire questions [14] asked of the potential jurors gave defendant " ' "an adequate opportunity to gain the information necessary to evaluate jurors." ' " *Barrett*, 868 P.2d at 98 (citations omitted). Accordingly, the trial court did not abuse its discretion in refusing to further question these two jurors.

## C. Defense Witness

Defendant claims the trial court abused its discretion by excluding the testimony of his

---

**14.** Other voir dire questions posed to the potential jurors included whether they had been victims of theft related crimes or whether they had any experience with adoption proceedings.

defense witness, Roland Oliver. Oliver's testimony was relevant, defendant argues, because it would have shown that Giffen and Bushman provided incompetent adoption services to defendant and his wife and, therefore, caused defendant's behavior. The trial court excluded Oliver's evidence as irrelevant under Rule 402 of the Utah Rules of Evidence and, in the alternative, as having the tendency to mislead and/or confuse the jury under Rule 403 of the Utah Rules of Evidence.[15]

Rule 402 provides that "[a]ll relevant evidence is admissible." Utah R.Evid. 402. Rule 401 of the Utah Rules of Evidence provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R.Evid. 401.

■ A trial court is accorded broad discretion in determining whether proffered evidence is relevant, and we will disturb that determination only if the trial court has abused that discretion. *State v. Harrison*, 805 P.2d 769, 780 (Utah App.), *cert. denied*, 817 P.2d 327 (Utah 1991).

■ We agree with the trial court that Oliver's testimony was irrelevant to the issues before the court. Defendant's trial counsel advised the court that Oliver would have testified

> that adoption agencies, because they are certified by the state and required to do these things, perform certain services to adopting parents and to mothers who wish to place their children for adoption. We feel that had some of these procedures existed in this case, that the problems that occurred here would not have happened.

Defendant's argument that this evidence would have shown that, under different circumstances, he would not have conducted himself as he did, is without merit. What is relevant to the issues at hand is whether defendant, under the facts of the case, intended to obtain the three couples' money by falsely claiming that he intended to give his unborn child up for adoption. It is wholly irrelevant what defendant "may" have done under different circumstances and, as the State correctly points out, purely speculative. This is especially true given the fact that adoptions through a state licensed adoption agency have an entirely different set of procedures in place than those done through a private attorney. While the procedures Oliver was prepared to testify to may well be "proper adoption procedures" through a state licensed agency, this is not relevant to whether the procedures followed by Giffen or Bushman in the private adoption arena were proper or defendant's intent at the time he obtained money from the victims. Accordingly, the trial court did not abuse its discretion in determining that Oliver's testimony was irrelevant under Rule 402.

■ Even if we were to conclude that Oliver's testimony was relevant and therefore admissible under Rule 402, the trial court did not abuse its discretion by excluding the testimony under Rule 403. Rule 403 provides, in pertinent part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues, or misleading the jury." Utah R.Evid. 403. "If the evidence has an unusually strong propensity to ... mislead a jury, we require a showing of unusual probative value before it is admissible under rule 403." *State v. Troyer*, 910 P.2d 1182, 1191 (Utah 1995). "The trial court has 'considerable freedom ... to make [Rule 403] decisions which appellate judges might not make themselves ab initio but will not reverse.' " *State v. Blubaugh*, 904 P.2d 688, 699 (Utah App.1995), *cert. denied*, 913 P.2d 749 (Utah 1996) (quoting *State v. Pena*, 869 P.2d 932, 937–38 (Utah 1994)). This court will not reverse a trial court's Rule 403 determination absent an abuse of discretion. *Troyer*, 910 P.2d at 1191; *Blubaugh*, 904 P.2d at 699. A trial court abuses its discretion if its Rule 403 ruling is " 'beyond the limits of reasonability.' " *Troyer*,

---

15. While defendant attempts to advance a constitutional argument regarding the exclusion of Oliver's testimony, he did not do so before the trial court. "Accordingly, we limit our analysis to the Utah Rules of Evidence implicated by [defendant's] arguments to the trial court." *State v. Harrison*, 805 P.2d 769, 780 (Utah App.), *cert. denied*, 817 P.2d 327 (Utah 1991).

910 P.2d at 1191 (quoting *State v. Dunn*, 850 P.2d 1201, 1221 (Utah 1993)); *accord Blubaugh*, 904 P.2d at 699.

Here the proposed testimony clearly had a strong propensity to confuse and/or mislead the jury. Emphasizing what defendant characterizes as misdoings by the attorneys based on wholly dissimilar procedures in a state licensed adoption agency only clouds the real issue before the court—defendant's intent to obtain the victims' money by deception. Additionally, defendant has failed to show this court that dissimilar procedures between a state licensed adoption agency and a private adoption attorney have an unusual probative value, thereby outweighing the strong propensity of the evidence to confuse or mislead the jury. Thus, the trial court's decision to exclude the evidence under Rule 403 was not " 'beyond the limits of reasonability,' " *see Troyer*, 910 P.2d at 1191 (citation omitted), and we affirm it on appeal.

### D. Failure to Give Requested Instructions

 Defendant contends the trial court erred in refusing to submit to the jury two instructions proposed by defense counsel. We review the trial court's failure to give requested jury instructions for correctness, granting the trial court no particular deference in its determination. *Ong Int'l U.S.A. Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 452 (Utah 1993); *Anderson v. Sharp*, 899 P.2d 1245, 1248 (Utah App.), *cert. denied*, 910 P.2d 426 (Utah 1995).

Defendant submitted proposed instructions numbered eight and nine which quote portions of Rules 1.7 and 1.8 of the Utah Rules of Professional Conduct. On appeal and in support of his claim that the trial court erred in refusing to give the proposed jury instructions, defendant merely states that these instructions "would have assisted defense counsel in elucidating the shortcomings in the performance of the attorneys Giffen and Bushman, and thus in explaining why the Vigils sought out successive prospective adoptive couples." There is no further analysis, insufficient citation to legal authorities, and no citation to the record upon which defendant relies. It is well established that this court will decline to consider an argument that a party has failed to adequately brief. *See State v. Price*, 909 P.2d 256, 263 (Utah App.1995), *cert. denied*, 916 P.2d 909 (Utah 1996). Because of the inadequate analysis, we decline to address defendant's claim on appeal.

### E. Failure to Request/Give Statutory Defense Instructions

Notwithstanding the competence of trial counsel and the trial court's alleged errors with regard to the foregoing issues, defendant contends that his trial counsel was ineffective because he failed to request jury instructions setting out the statutory defenses to theft by deception. Because trial counsel did not request such instructions, defendant asserts his trial counsel was ineffective and/or the trial court committed plain error.

Section 76–6–402 of the Utah Code provides three defenses to theft by deception:

(3) It is a defense under this part that the actor:

(a) Acted under an honest claim of right to the property or service involved; or

(b) Acted in the honest belief that he had the right to obtain or exercise control over the property or service as he did; or

(c) Obtained or exercised control over the property or service honestly believing that the owner, if present, would have consented.

Utah Code Ann. § 76–6–402 (1995).

Section 76–6–405 provides:

(2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance....

*Id.* § 76–6–405(2).

 It is well established that in order to succeed on an ineffective assistance of counsel claim,

a defendant must show (1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different.

*State v. Smith,* 909 P.2d 236, 243 (Utah 1995). If this court determines that "it is easier to dispose of the issue on" the second element enumerated above, then we may do so without reaching the first element. *Price,* 909 P.2d at 264.

Defendant's claim of ineffective assistance of counsel fails because he made no attempt to show this court how the outcome of the trial would have been different had the instructions been submitted to the jury. Defendant simply states, "Given the absence of any true defense instructions, and given the evidence in this case, trial counsel's failure to request the instructions was also prejudicial." This is insufficient to show that had trial counsel submitted the instructions, the outcome of defendant's trial would have been different and does not merit a reversal of defendant's conviction. *See State v. Archuleta,* 747 P.2d 1019, 1023 (Utah 1987) (defendant's ineffective assistance of counsel claim failed based on defendant's failure to show prejudice).

Alternatively, defendant argues that even if failure to request the instructions did not amount to ineffective assistance of counsel, it was plain error for the trial court not to have submitted the above defenses to the jury. In order to demonstrate plain error, defendant must show (1) error, (2) that the error should have been obvious to the trial court, and (3) that the error was harmful. *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993); *State v. Tenney,* 913 P.2d 750, 756 (Utah App.1996).

Defendant argues that because the statutory language in sections 76–6–402 and 76–6–405 is clear and unambiguous it was error to fail to instruct on the defenses and that error "should have been plain to the trial court." Even if we assume it was error to fail to provide the jury the statutory defenses to theft by deception, this failure was far from obvious. Defendant's trial counsel pursued a consistent defense theory throughout the trial proceedings, namely, that defendant's conduct was based on the attorneys' misdeeds.[16] Indeed, during an argument to

the trial court, defense counsel stated, "What we will argue to the jury is that there was no deliberate attempt to defraud anyone and *that [the] misunderstandings occurred as a result of conduct of the attorneys.*" (Emphasis added.) Additionally, during closing arguments, defendant's counsel argued that defendant "d[id] not obtain or exercise control over the money. No checks were ever written to Thomas Vigil. He is neither the object nor the reason for the money being given." Whether defendant was claiming that he had an "honest claim of right" to the money contradicts defendant's trial counsel's argument that he had no control over the money and may or may not be inconsistent with attorney misconduct. Thus, because defendant's defense at trial was not apparently based on the statutory defenses, we conclude no error existed which would have been plain to the trial court. *Cf. State v. Bishop,* 753 P.2d 439, 489 (Utah 1988) (where instruction was inconsistent with defendant's theory of case, no error in refusing instruction); *State v. Pendergrass,* 803 P.2d 1261, 1264–65 (Utah App.1990) (no error when trial court refused to submit requested instruction which was inconsistent with defendant's theory of defense).

## IV. CONCLUSION

We hold that the trial court correctly concluded theft by deception can occur in an adoption setting and, therefore, it properly instructed the jury on this issue. Because defendant failed to adequately brief his argument regarding the propriety of the trial court's refusal to ask potential jurors two questions submitted by defendant, we decline to address it on appeal. We conclude the trial court did not abuse its discretion in refusing to further question two jurors who had been exposed to media concerning failed adoptions, nor did it abuse its discretion in excluding Roland Oliver's testimony. We do not address defendant's claim that the trial court erred in refusing to submit two of his proposed instructions to the jury because defendant failed to adequately brief the issue

---

**16.** Defendant does not argue the attorneys wrongly informed him that he had "an honest claim of right to" the money, but that they instead performed inadequate services which forced him to look for a new attorney and, he reasons, new prospective adoptive parents.

on appeal. Lastly, defendant's ineffective assistance of counsel claim fails because defendant has not shown how he was prejudiced by the omission of the defense instructions. Because trial counsel was advancing a different theory of defense at trial, the trial court did not commit plain error by not submitting the statutory defense instructions sua sponte. Defendant's convictions are affirmed.

BILLINGS and WILKINS, JJ., concur.